UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEVEN M. MENDELSOHN, | : | CIVIL ACTION NO. |
| Individually and on behalf of all others | : | 3:11-CV-1500 (JCH) |
| Similarly situated | : | |
|     Plaintiff, | : | |
| | : | |
|     v. | : | MARCH 27, 2012 |
| | : | |
| BIDCACTUS, LLC | : | |
|     Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION TO DISMISS (Doc. No. 17)**

## I. INTRODUCTION

Plaintiff, Steven Mendelsohn, brings this action on behalf of himself and all others similarly situated, against defendant, Bidcactus, LLC (hereafter "BidCactus"). Mendelsohn alleges various causes of action related to BidCactus's business activities. Specifically, Mendelsohn claims for the recovery of money lost in wagering, unjust enrichment, and money had and received, as well as for violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq (hereafter "CUTPA"). BidCactus has filed a Motion to Dismiss all of Mendelsohn's claims.

## II. BACKGROUND[1]

BidCactus is a "penny auction" website. See Compl. at ¶ 13. Through its web-based interactive service, customers purchase bids and attempt to win various consumer goods through auction, including widely popular items such as HP laptops, Sony cameras, KitchenAid appliances, and Apple iPads. Id. at ¶¶ 2, 11. BidCactus promotes itself as an "entertainment auction," and it entices consumers to buy bids, with

---

[1] For the purposes of a motion to dismiss, the court takes the factual allegations in a complaint as true, and draws all reasonable inferences in favor of the plaintiff.

1

the promise of obtaining these types of products at significant discounts from retail prices.  Id. at ¶ 1.  At any given time, the site conducts multiple auctions.  Id.  Each auction typically lasts many hours, and may run for several days.  See id.

In order to bid in an auction, a consumer must purchase "bids" from BidCactus.  Id. at ¶ 1.  Each bid costs seventy-five cents, and each bid placed by a consumer in an auction raises the purchase price of the auction item by one cent.  Id.  When a consumer places a bid, the consumer pays seventy-five cents for each bid, regardless of whether or not the consumer actually wins the item.  Id. at ¶ 37.  Towards the end of an auction, each additional bid adds a number of seconds back to the clock to allow additional bidders to respond.  Id. at ¶ 36.  The last bidder wins the right to purchase the item at the final auction price.  Id.  The total price paid by the winning bidder equals the cost of all the bids he placed, plus the purchase price of the item, as determined by the auction, and shipping costs for the item.  Id. at ¶ 35.  Often, this final cost to the consumer is greater than the stated retail value of the item.  Id. at ¶ 41.  Those consumers who bid on the item, but were not the final bidder, still lose the total cost of their bids.  Id. at ¶ 37.

BidCactus's website has various versions of the homepage.  Id. at ¶ 14.  Each version addresses one of three topics: (1) BidCactus is "the auction site you can trust," (2) it is possible to save "90% on your favorite products," and (3) a customer can "earn prizes" at a reward store.  Id. at ¶ 15.  The webpage stating that 90% savings are possible also displays pictures of items such as a Sony camera, laptop, retail gift card, and a KitchenAid mixer.  Id. at ¶ 16.  Additionally, the page displays a red box that says "Start Now!" and provides a link to allow customers to register and begin bidding.  Id.

Finally, each page also lists auctions that are currently ongoing and available for bidding. Id. at ¶ 17. Each listed auction displays a valuable item, the amount of time left in the auction, and the current price. Id. Often, there will only be seconds left in the auction and the purchase price will be less than one dollar. Id. As each additional bid after a certain time period triggers the addition of more time to the auction, however, these auctions that appear to be about to end will often go on for many more hours, or even for days. Id.

Each homepage also displays a running total of nearly 300,000 "auctions won on BidCactus by real people like you." Id. at ¶ 18. Each auction listed in this section shows an auction that was supposedly completed within the past few minutes and won for only cents, or a few dollars, and many are high ticket items. Id. The webpage also displays user testimonials of people discussing valuable items they won for a fraction of the item's value. Id. at ¶ 19. In addition, the homepage displays several emblems and logos, including McAfee Secure, PayPal, Ernst & Young, Better Business Bureau, and Entertainment Auction Association, an organization of which BidCactus is a founding member. See id. at ¶ 21–25.

When a potential customer visits the homepage, a blue and green section at the top right of the page states "(1) 'register'; (2) 'buy bids'; (3) 'bid & win'." Id. at ¶ 27. By clicking on almost any link on the homepage, a consumer will be directed to the registration page. Id. at ¶ 28. To register, a consumer must enter basic information such as his or her name, email address, user name, and password. Id. at ¶ 29. After a consumer registers, he or she is directed to the page for purchasing bids. Id. at ¶ 32. To begin using the site, a consumer must purchase at least thirty bids, at a cost of

$22.50. Id. At no time is the consumer directed to review the pages describing the Terms of Use, How BidCactus Works, Frequently Asked Questions, or Tips and Tricks, which are all located under the Help tab. See id. at ¶¶ 28–33. A new user is not required to check a box agreeing that he has read and agreed to BidCactus's Terms of Use. Id. at ¶ 28.

BidCactus does not indicate anywhere on its website that it is conducting a lottery, or any other type of gambling. Id. at ¶ 42. In addition, it does not disclose any information regarding a consumer's odds of winning or the (low) probability of benefitting financially from using the site. Id. at ¶ 44.

Mendelsohn became a registered user of BidCactus on November 12, 2010. Id. at ¶ 46. On the first day he registered, Mendelsohn won four auctions: a Eureka steam mop; a $50 Starbucks gift card; a $50 Target gift card plus a 50-count Bidpack of bids to be used in other BidCactus auctions; and a $100 Walmart gift card plus a 100-count Bidpack. Id. at ¶ 47. The suggested retail value of these prizes, as stated by BidCactus, was $392.49. Id. The sum of the displayed winning prices for all four items equaled $14.41. Id. The actual cost to Mendelsohn, however, was $705.51. Id. On the first day he registered, Mendelsohn spent approximately $800 on the site. Id. at ¶ 48.

Ultimately, Mendelsohn won a total of twenty-six auctions on BidCactus. Id. at ¶ 49. In total, Mendelsohn paid at least $15,219.56 to Bidcactus. Id. Mendelsohn spent $6,574.94 on prizes alone, though the total stated retail value of the prizes he won only equaled $6,032. Id. This cost amounted to a loss of $543.27. Id.

Mendelsohn's total loss from using the site was $9,187.56.[2]  Id.  Mendelsohn did not realize the amount of money he had lost for several weeks.  Id.

## III.   STANDARD OF REVIEW

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court takes the allegations of the Complaint as true and construes them in a manner favorable to the plaintiff.  See, e.g., Hoover v. Ronwin, 466 U.S. 558, 587 (1984); Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002).  The court must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Yung v. Lee, 432 F.3d 142, 146 (2d Cir. 2005).

A motion to dismiss for failure to state a claim tests only the adequacy of the Complaint.  See United States v. City of New York, 359 F.3d 83, 87 (2d Cir. 2004).  Bald assertions, and mere conclusions of law, do not suffice to meet the plaintiff's pleading obligations.  See Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 344 (2d Cir. 2006).  Instead, a plaintiff is obliged to "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007), rev'd on other grounds sub. nom. Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).  The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft, 129 S.Ct. at 1949.

## IV.   DISCUSSION

BidCactus contends that Mendelsohn's claims all rest on his assertion that BidCactus's auctions amount to illegal gambling.  See Mem. Supp. Mot. to Dismiss at 2. BidCactus asserts that Mendelsohn fails to state a claim that its actions consist of illegal

---

[2] Mendelsohn states that he ultimately paid $15,219.56 to BidCactus.  Compl. at ¶ 49.  Later in the same paragraph, he states that the total was $15,219.59.  The court assumes this discrepancy is a typographical error, and will presume that the correct total is $15,219.56, Mendelsohn's first assertion.

5

gambling and, consequently, the court should dismiss Mendelsohn's claims. As this contention underlies many of BidCactus's arguments, the court will first address whether Mendelsohn has asserted sufficient facts to allege illegal gambling.

    A.    <u>Gambling</u>

Section 53-278a(2) of the Connecticut General Statutes defines "gambling" to mean "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . but does not include: Legal contests of skill, speed, strength or endurance in which awards are made only to entrants or the owners of entries . . . ." Similarly, "professional gambling means accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling, or any claim thereon or interest therein," and includes conducting lotteries and the disposal or sale of property by lottery. <u>See</u> Conn. Gen. Stat. § 53-278a(3). Pursuant to Conn. Gen. Stat. § 53-278b, "[a]ny person who engages in gambling, or solicits or induces another to engage in gambling . . . shall be guilty of a class B misdemeanor . . . ."

Gambling exists where the element of chance predominates over skill; it is not necessary for the element of chance to be exclusively responsible for a win. <u>See</u> Conn. Gen. Stat. § 53-278a(2) (gambling means risking something of value "for gain contingent in whole <u>or in part</u> upon . . . chance") (emphasis added); <u>State v. Dorau</u>, 124 Conn. 160, 168 (1938); <u>see</u> <u>also</u> Conn. Op. Atty. Gen., 2005 WL 40734, at *3 (Jan. 4, 2005) ("Chance must be partly responsible for a win, but need not be exclusively responsible."). The element of chance may exist where "the financial gain of [a participant] is the result of factors outside his control." <u>See</u> <u>State v. Bull Inv. Grp.</u>, 32

6

Conn. Sup. 279, 289 (Conn. Super. Ct. 1974); see also Public Clearing House v. Coyne, 197 U.S. 497, 513 (1904) ("[T]he amount of such return depends so largely, and, indeed, almost wholly, upon conditions which the member is unable to control, that we think it fulfills all the conditions of a distribution of money by chance.").

BidCactus contends that Mendelsohn's allegations demonstrate that the outcomes of its auctions are dependent on human behavior, not chance. See Mem. Supp. Mot. to Dismiss at 10. Further, BidCactus contends that Mendelsohn acknowledges that bidding skills influence the outcome of the auctions and, thus, fails to allege that chance predominates over skill. Id. at 11. Mendelsohn's Complaint states that a bidder's success depends on several factors outside the bidder's control, including "how many other people are bidding on the item, what prices those persons are willing to pay, and whether the other persons have sufficient bids left to enable them to pay more, if they choose, than the consumer." Compl. at ¶ 38. In addition, Mendelsohn asserts that BidCactus has guided consumers into registering and bidding "without perusal of the voluminous materials on the Site," and thus, "winning an auction becomes for the average user a matter almost entirely of luck." Id.

Taking Mendelsohn's well-pleaded, non-conclusory allegations as true, he adequately states factors beyond a bidder's control that significantly affect whether a consumer wins a particular auction. See Compl. at ¶ 38. Though Mendelsohn acknowledges that "bidding skills make a difference," this statement does not preclude him from demonstrating that BidCactus is engaged in gambling, by showing that chance predominates over a consumer's use of bidding skills. See State v. Parker, 222 A.2d 582, 584 (Conn. Cir. Ct. 1966).

BidCactus also contends that Mendelsohn fails to state facts to support the assertion that a consumer is risking something of value when he or she places a bid. See Mem. Supp. Mot. to Dismiss at 14–15.  BidCactus argues that a consumer's money is never at risk because, once the consumer places the bid, the cost of the bid is lost forever, whether the consumer wins the auction or not.  See id.  As such, BidCactus characterizes the money spent on each bid as an "entry fee."  See id. at 12–13.  In response, Mendelsohn argues that BidCactus's activities are more akin to a lottery, which is expressly included in the definition of "professional gambling" stated in section 53-278a(3) of the Connecticut General Statutes.  See Mem. Opp. Mot. to Dismiss at 24.

In Connecticut, a lottery is characterized by three elements: a prize, a chance, and a price.  See Farina v. Kelly, 147 Conn. 444, 449 (1960).  Mendelsohn argues that his Complaint states facts to support each of these elements.  See Mem. Opp. Mot. to Dismiss at 25.  The price of entering is the seventy-five cent bids, the chance is as discussed above, and the prize is "the right to buy merchandise at a discount, allegedly a huge discount of up to 90%."  See id.  Taking Mendelsohn's allegations as true, he adequately pleads a factual basis to support the conclusion that BidCactus's activities constitute a lottery.[3]  See Compl. at ¶¶ 37–39.

As Mendelsohn has sufficiently pled facts to support both the element of chance and the existence of risk, Mendelsohn has set forth a sufficient basis to state a claim for illegal gambling.  Consequently, the court will not dismiss any of Mendelsohn's claims

---

[3] BidCactus's attempt to characterize the cost of bidding as an entry fee is unavailing at this stage, as the court is required to assume the truth of Mendelsohn's allegations.  Furthermore, the cases BidCactus cites in support of this assertion are distinguishable here, as Mendelsohn asserts that the prize to be awarded is the right to buy the merchandise at the price determined by auction, and therefore does not have a set price.  See, e.g., Humphrey v. Viacom, 2007 WL 1797648, at *8 (D.N.J. June 20, 2007) ("[E]ntry fees do not constitute bets or wagers where they are paid unconditionally for the privilege of participating in a contest, and the prize for an amount certain that is guaranteed to be won by one of the contestants (but not the entity offering the prize).").

on the basis that, as a matter of law, BidCactus is not engaged in illegal gambling or professional gambling.

  B. <u>Recovery of Money Lost in Wagering</u>

  Mendelsohn's first claim arises under section 52-554 of the Connecticut General Statutes. Pursuant to this statute, "[a]ny person who, by playing at any game . . . loses the sum or value of one dollar . . . may, within three months next following, recover from the winner the money or the value of the goods so lost and paid or delivered, with costs of suit in a civil action, without setting forth the special matter in his complaint." Conn. Gen. Stat. § 52-554. BidCactus argues that Mendelsohn is barred by the statute of limitations from claiming under this statute. <u>See</u> <u>Mem. Supp. Mot. to Dismiss</u> at 16.

  BidCactus argues that, pursuant to section 52-554, Mendelsohn's claim was barred as of March 12, 2011, well before Mendelsohn filed his claim on September 29, 2011. <u>See</u> <u>id.</u> at 16. Mendelsohn responds by asserting that the statute merely provides "a three-month window where a party does not have to set forth the special matter in his complaint," and after this window has expired, a plaintiff must plead his loss in greater detail. <u>See</u> <u>Mem. Opp. Mot. to Dismiss</u> at 27–28.

  In considering this statute, the Connecticut Supreme Court has stated that the purpose of the statute is to "afford the plaintiff a means of recovery which did not involve a confession of gambling upon his part," by allowing him, within three months, to present his complaint without pleading specific details of the conduct which led to this loss. <u>See</u> <u>Macchio v. Breunig</u>, 125 Conn. 113, 115–16 (1939). The <u>Macchio</u> Court does not, however, go on to hold that, beyond three months, a plaintiff is barred from bringing an action. <u>See</u> <u>id.</u> Likewise, in <u>Karjohn v. Davis</u>, a Superior Court similarly

avoided imposing a three month statute of limitations, finding that an issue of fact existed with regard to when such a period would even begin. See 1990 WL 283898, at *1 (Conn. Super. Ct. July 10, 1990). As the Connecticut courts have declined to impose a three month statute of limitations with regard to this statute, neither will this court. Consequently, Mendelsohn's claim in Count One, pursuant to section 52-554 of the Connecticut General Statutes, may go forward, as Mendelsohn has pled sufficient specific details regarding the conduct which led to his losses.

    C.    CUTPA Claims

In Count Two, Mendelsohn asserts that BidCactus engaged in unfair trade practices, in violation of CUTPA, Conn. Gen. Stat. § 42-110a et seq. BidCactus contends that Mendelsohn's claim in Count Two for unfair trade practices must be dismissed because Mendelsohn cannot demonstrate that BidCactus is involved in illegal gambling and, therefore, cannot demonstrate that BidCactus is engaged in an activity that violates public policy. See Mem. Supp. Mot. to Dismiss at 17–18.

A plaintiff may establish a violation of CUTPA by demonstrating either "an actual deceptive practice . . . or a practice amounting to a violation of public policy." See Miller v. Guimaraes, 78 Conn. App. 760, 775 (Conn. App. Ct. 2003) (internal quotations omitted). In evaluating CUTPA claims, a court considers whether the practice offends public policy, as established by statutes and common law, as well as whether the practice is immoral, unethical, oppressive, or unscrupulous. See id.

Here, Mendelsohn contends that BidCactus violates public policy by engaging in illegal gambling and professional gambling. See Compl. at ¶¶ 66–70. As discussed above, see supra Section IV.A, Mendelsohn asserts an adequate factual basis to

support his claims that BidCactus is engaged in illegal gambling. Consequently, dismissal is not warranted with regard to Count Two.

Next, Mendelsohn asserts that BidCactus engaged in deceptive trade practices by creating the false impression that users would routinely win the right to purchase valuable merchandise at a significant discount. See Compl. at ¶¶ 77–80. BidCactus contends that Mendelsohn fails to assert that any of BidCactus's claims are actually false and, furthermore, that Mendelsohn fails to assert that BidCactus had any affirmative duty to disclose any additional information. See Mem. Supp. Mot. to Dismiss at 18–19.

To demonstrate that an act or practice is deceptive, a plaintiff must demonstrate that three conditions are met. First, there must be a "representation, omission, or other practice likely to mislead consumers." See Miller, 78 Conn. App. at 775 (internal quotations omitted). Second, "the consumers must interpret the message reasonably under the circumstances." Id. Third, "the misleading representation, omission, or practice must be material – that is, likely to affect consumer decision or conduct." Id. A party's statements taken as a whole may be misleading, even where each statement separately is literally true. See Donaldson v. Read Magazine, 333 U.S. 178, 188 (1948).

A failure to disclose "can only be deceptive if, in light of all the circumstances, there is a duty to disclose." Miller, 78 Conn. App. at 776 (internal quotations omitted). Generally, silence cannot give rise to an action for failure to disclose. See id. A duty to disclose arises, however, where a party voluntarily makes some disclosure, as "[a] party

who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." See id.

Mendelsohn contends that BidCactus's website is "designed to create and does create the false impression and makes false representations that users of the Site will routinely win the right to purchase valuable merchandise at significant discounts and that the overwhelming majority of users will benefit financially from using the Site." Compl. at ¶ 77.  In support of this assertion, Mendelsohn describes in some detail the layout of the website, statements set forth on the various homepages regarding the discounts available through BidCactus's auctions, and the registration process.  See id. at ¶¶ 12–19; 29–33.  Specifically, Mendelsohn describes BidCactus's assertions that consumers can "Save Up to 90% off your favorite products," that there have been 300,000 "auctions won on BidCactus by real people like you," and that a consumer may simply "(1) 'register'; (2) 'buy bids'; (3) 'bid & win!'."  See id. at ¶¶ 16, 18, 27.  Though each of these statements may literally be true, Mendelsohn has set forth an adequate factual basis to state a claim that, when taken as a whole, these statements could mislead a reasonable person into believing that he would easily obtain such discounts through BidCactus's auctions.

Mendelsohn also asserts several omissions which he contends were deceptive, including that BidCactus failed to inform its customers that it is accepting wagers, or is engaged in professional gambling; about the percentage of money spent by customers on the site that is returned to customers in the form of merchandise; and "that the overwhelming majority of customers using the site will lose money by doing so."  See

Compl. at ¶ 78.  BidCactus contends that it was under no duty to disclose this information.  See Mem. Supp. Mot. to Dismiss at 19–20.

Mendelsohn asserts that BidCactus's repeated statements regarding users saving up to 90%, thousands of users winning and obtaining huge discounts, and displays of auctions just completed or about to be completed gives a false impression of "repeated user success."  See Mem. Opp. Mot. to Dismiss at 12.  In the franchise context, a duty to disclose the attrition rate of franchises may arise where the franchisor makes misleading representations that imply that the majority of franchisees will enjoy great success when, in fact, such success is atypical.  See Bailey Empl. Sys., Inc. v. Hahn, 545 F. Supp. 62, 71 (D. Conn. 1982).  Similarly, Mendelsohn alleges here that BidCactus's representations--regarding the availability of steep discounts and likelihood of success--mislead consumers and give rise to a duty to disclose information such as the percentage of money spent by consumers that is returned to them in merchandise and that the majority of users will lose money through bidding.  See Compl. at ¶¶ 77–78.

BidCactus contends that Bailey is inapplicable here because, in that case, the Federal Trade Commission specifically required franchisors to disclose information about the franchise's success.  See Reply at 8.  The court in Bailey, however, makes clear that its decision is not solely reliant on the F.T.C. rule, as Connecticut courts applying CUTPA are not limited by the F.T.C. or federal law.  See 545 F. Supp. at 71 ("[E]ven if the F.T.C. had promulgated no specific rule regarding unfair or deceptive practices by franchisors, the Connecticut courts would be free to find such practices unlawful simply if they had the 'tendency or capacity' to deceive.").  Here, Mendelsohn has sufficiently pled a factual basis to support his assertion that BidCactus's statements

had the "tendency or capacity to deceive" and gave rise to a duty to disclose.[4] Accordingly, Mendelsohn adequately states a deceptive trade practices claim under CUTPA in Count Two.

### D. Unjust Enrichment and Money Had and Received

Finally, BidCactus asserts that Mendelsohn's claims in Counts Four and Five for unjust enrichment and money had and received must be dismissed because such claims are barred where a valid contract exists. See Mem. Supp. Mot. to Dismiss at 20–21. In response, Mendelsohn argues that he may plead in the alternative, and contests that he has pled an express contract. See Mem. Opp. Mot. to Dismiss at 28–29. Further, Mendelsohn argues that any such contract would be illegal and unenforceable as a wagering contract.[5] See id. at 29–30.

Unjust enrichment, and money had and received, allow a party to recover a benefit conferred on a defendant. See Burns v. Koellmer, 11 Conn. App. 375, 385 (Conn. App. Ct. 1987); Town of Stratford v. Castater, 2011 WL 1288675, at *3 (Conn. Super. Ct. Mar. 15, 2011). Where an enforceable express or implied-in-fact contract exists between parties, however, a claim of unjust enrichment may not stand. See Harris v. Shea, 2002 WL 31939113, at *3 (Conn. Super. Ct. Dec. 24, 2002). Similarly, a party may not recover under money had and received where the payment was authorized, by contract or otherwise, and not a mistake. See Town of Stratford, 2011 WL 1288675, at *4. An express contract exists where "the terms of the contract are

---

[4] The court notes that, when evaluating whether an act or practice has the tendency or capacity to deceive, it looks to the least sophisticated reader. See Bailey, 545 F. Supp. at 67.

[5] Mendelsohn also argues that, if a valid, enforceable contract exists, it would not provide him a remedy for its breach; however, the court decides this issue on other grounds and need not address this argument.

14

expressed by the direct words of the parties." See Burns, 11 Conn. App. at 388. Even where an express contract exists though, a court will not enforce contractual obligations that arise from an agreement that is against public policy. See Gagne v. Vaccaro, 255 Conn. 390, 407–08 (2001). By statute, all wagers and "all contracts . . . of which the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game . . . shall be void." See Conn. Gen. Stat. § 52-553.

BidCactus asserts that, because Mendelsohn registered on its website, the Terms of Use govern the relationship between Mendelsohn and BidCactus. See Reply at 10. Mendelsohn specifically alleges, however, that a user is not required to agree to the Terms of Use in order to register and bid at BidCactus's website.[6] See Compl. at ¶ 31. Further, as discussed above, see supra Section IV.A, Mendelsohn has set forth sufficient facts to support a claim that BidCactus is engaged in illegal gambling and professional gambling. As a result, Mendelsohn sets forth a factual basis for the conclusion that no express contract exists between the parties, and any implied in fact contract existing between the parties is void and unenforceable pursuant to section 52-553 of the Connecticut General Statutes. Consequently, on the face of the Complaint, Mendelsohn's claims are not barred by an enforceable contract, and dismissal is not warranted with regard to Counts Four and Five.

## V. CONCLUSION

For the foregoing reasons, the court **denies** defendant's Motion to Dismiss (Doc. No. 17).

---

[6] At oral argument, defendant represented that a user must explicitly agree to the Terms of Use before purchasing bids and, therefore, may not bid without agreeing to the Terms of Use. As this is a factual dispute, it is not properly addressed at this stage.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 27th day of March, 2012.

                                         /s/ Janet C. Hall
                                        Janet C. Hall
                                        United States District Judge